# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                                                                        Page 1
Not Reported in F.Supp.2d, 2002 WL 1020782 (W.D.N.Y.)
**(Cite as: 2002 WL 1020782 (W.D.N.Y.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.
CLUB PROTECTOR, INC. and William Held,
Plaintiffs,
v.
Joseph PETA and J.G. Peta, Inc. d/b/a Coverall
Manufacturing, Defendants.
**No. 01-CV-0337E(SR).**

March 8, 2002.

MEMORANDUM and ORDER

ELFVIN, S.D.J.

*1 Plaintiffs commenced this action for a declaratory judgment as to the ownership of a patent said have been or about to be issued to defendant Joseph Peta, and for conversion and *prima facie* tort by the defendants. The Complaint was filed in the New York Supreme Court, Erie County April 12, 2001. By motion dated May 10, 2001 defendants removed the case to this Court. Presently before this Court are a motion by plaintiffs to remand the case to state court and a motion by defendants to have plaintiffs' case dismissed for failure to state a cause of action. For the reasons which follow, plaintiffs' motion will be denied and defendants' motion will be granted.

As a preliminary matter, this Court notes that the parties were scheduled to appear before the undersigned on Friday, June 29, 2001 for oral arguments on both of these motions. Defendants appeared and argued their motion to dismiss but plaintiffs failed to appear or seek an adjournment despite adequate notice of the proceedings. This Court therefore deemed the motion to remand abandoned and denied it from the bench. As a result, this Court retains jurisdiction over this case.

Plaintiff Club Protector, Inc. manufactures and sells a patented product known as the "Club Protector" which consists of--*inter alia*--a cover designed to overlay and protect from rain golf clubs as the same are carried in bags on the back of a golf cart. Plaintiff Held was issued a patent therefor by the United States Patent and Trademark Office ("PTO") on May 16, 1989--patent number 4,803,037 (the "037 patent")--and assigned the same to Club Protector, Inc. Defendant J.G. Peta, Inc. sells a competing product which performs the same function and is known as the "Peta Bag Cover." Held learned, on March 9, 2001, that Joseph Peta, the President of J.G. Peta, Inc., expected the PTO to issue a patent to him with respect to the Peta Bag Cover and consequently filed the present lawsuit soon thereafter. [FN1] This patent was in fact issued to Peta May 8, 2001 as patent number 6,227,217 (the "217 patent").

> FN1. A related action is currently pending in the Northern District of New York in which defendant has sought declaratory judgment as to plaintiffs' claims that Peta's product infringes the 037 patent and in which plaintiffs have asserted their own counterclaims for patent infringement against defendant. This action does not concern the 037 patent but rather is an action for a declaratory judgment as to the ownership of the Peta patent.

Plaintiffs allege that the point of novelty of claim 1 of the 217 patent-- referred to as the "fourth member" [FN2]--was in fact invented by Held and incorporated into the 037 patent; [FN3] Joseph Peta would therefore never have been awarded the 217 patent had he not incorporated therein the fourth member and, accordingly, a judgment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2002 WL 1020782 (W.D.N.Y.)

**(Cite as: 2002 WL 1020782 (W.D.N.Y.))**

declaring that Held owns the 217 patent's "invention" is warranted. Other than the presence of the fourth member, the entire 217 patent consists of elements which were already found in the public domain. Held claims that Joseph Peta knew of the presence of Held's fourth member in the 037 patent before he filed the application [FN4] yet he did not reveal such to the PTO. Held also alleges that Joseph Peta then misled the PTO by reason of the description of the 037 patent contained in his patent application. Specifically, Held claims that Joseph Peta did not disclose that Held is the inventor.

> FN2. The fourth member was also referred to as the "mounting bracket" and the "mainframe bar" in the installation sheets.
>
> FN3. The fourth member was never separately patented but was only a component of the 037 patent combination.
>
> FN4. According to Held, Joseph Peta learned of the fourth member while attending a PGA trade show in Florida in 1999 at which Joseph Peta was present and admitted that he incorporated the unpatented fourth member into Peta's Inc.'s roof-mounted golf bag.

*2 Rather than seeking to invalidate the 217 patent, Held is seeking a declaratory judgment that he owns such. His argument is that, because he was the one who holds the patent for the point of novelty--*viz.*, the combination of the fourth member into the unit--on this invention, he should own the entire patent.

Both parties have extensively briefed the issue as to whether this Court has power to hear Held's declaratory judgment action or whether his proper remedy is to seek an interference proceeding before the PTO pursuant to 35 U.S.C. § 135 and 37 C.F.R. § 1.601 *et seq.* Specifically they dispute whether Held-- who is seeking only a declaration of the invalidity of the 217 patent--has presented this Court with a justiciable case or controversy sufficient to satisfy Article III. Assuming--without deciding--that there is a justiciable case or controversy, this Court would nevertheless grant defendants' motion to dismiss for failure to state a claim upon which relief may be granted.

Most patents involve a combination of elements discovered by others or found in the public domain. *Yamanouchi Pharm. Co. v. Danbury Pharmaceutical,* Inc., 231 F.3d 1339, 1343 (Fed.Cir.2000). "For if anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no other element, separately viewed, is within the grant." *Aro Mfg. Co. v. Convertible Top Co.,* 365 U.S. 336, 334 (1961). It is the combination which is the invention.

Claim 1 of the 217 patent contains the fourth member as an integral part. It also contains at least three other elements, none of which Held claims he has invented. The other independent claims of the 217 patent--claims 13 and 21--do not even incorporate the fourth member. Held does not assert that claim 1 of the 217 patent involves a novel combination of parts which combination he had patented. Held only claims that, because the novel combination of parts contained an element which had been a divulged part of his patent, he is entitled to a declaratory judgment from this Court that he owns such patent. In reviewing a claimed invention to determine whether it infringes upon another's, a district court is to look at the entire patent, and not at just a single part of it. *Para-Ordinance Mfg. v. SGS Imports Intern., Inc.* 73 F.3d 1085, 1088 (Fed.Cir.1995). Therefore the mere presence of a part invented--but not patented--by Held would be insufficient to declare that he owns such patent. The undersigned opines that the only way Held himself could have received the 217 patent is if he were claiming that he had invented this novel combination. *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 665 (Fed Cir.2000). There is nothing in his pleadings or motion papers which would even suggest that such is the case. Therefore and because inventorship of a point of novelty--in the combination invention--without more, is insufficient to claim ownership of the entire patent, Held's claim that he is the owner of the 217 patent will be dismissed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                           Page 3

Not Reported in F.Supp.2d, 2002 WL 1020782 (W.D.N.Y.)

**(Cite as: 2002 WL 1020782 (W.D.N.Y.))**

\*3 Plaintiffs have also brought a claim under New York's law for conversion. However, New York does not recognize a claim for conversion of intangible property. *Sporn v. MCA Records, Inc.,* 58 N.Y.2d 482, 489 (1983); *Leibowitz v. Maxwell,* 91 Civ. 4551, 1994 U.S. Dist. Lexis 13342 \*7 (S.D.N.Y. Sept. 21, 1994). Patents are considered to be intangible property--*Newark Morning Ledger Co. v. U.S.,* 546, 556 (1993)--and consequently cannot be converted. *Matzan v. Eastman Kodak Co.* 134 A.D.2d 863 (4th Dept.1987). Therefore, plaintiffs' claim for conversion will be dismissed.

Plaintiffs have also brought a claim for *prima facie* tort. New York courts recognize this action where there has been an intentional infliction of harm that causes special damages without excuse or justification solely due to the malice of a defendant by an act or series of acts that would otherwise be lawful. *Curiano v.. Suozzi,* 63 N.Y.2d 113, 117 (1984). Plaintiffs theorized that, if they were to be allowed to proceed with this action, discovery would reveal that Joseph Peta's acts in applying for the 217 patent were motivated solely by malice toward Held. The litigation to date between plaintiffs and defendants does show a degree of mutual hostility.

Irrespective of this, the undersigned cannot accept the idea that a patent can be obtained solely for malice. Patents are intended to protect one's interest in an invention and, while malice may have played a role in Joseph Peta's seeking the 217 patent, this Court is convinced that no amount of discovery could eliminate the possibility of a genuine business motive. Therefore and because plaintiffs cannot prove the malice necessary to succeed on a claim for *prima facie* tort, defendants' motion to dismiss this claim will be granted.

Accordingly it is hereby *ORDERED* that plaintiffs' motion to remand this case to state court is denied, that defendants' motion to dismiss plaintiffs' entire complaint for failure to state a claim upon which relief is granted and that this case shall be closed.

Not Reported in F.Supp.2d, 2002 WL 1020782 (W.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

- 1:01CV00337  (Docket)                    (May. 10, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 910405 (S.D.N.Y.), RICO Bus.Disp.Guide 10,125
**(Cite as: 2001 WL 910405 (S.D.N.Y.))**

H

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
JOHN PAUL MITCHELL SYSTEMS, Plaintiff,
v.
QUALITY KING DISTRIBUTORS, INC. et al.,
Defendants.
**No. 99 Civ. 9905(SHS).**

Aug. 13, 2001.

*OPINION & ORDER*

STEIN, J.

*1 Plaintiff John Paul Mitchell Systems, Inc., ("JPMS" or "Paul Mitchell") has moved for an order (1) pursuant to Rule 56 of the Federal Rules of Civil Procedure granting partial summary judgment against defendants Robert Seibel, Jerome Axelrod a/k/a Jerome Alexander, and Berin Axelrod a/k/a Berin Alexander ("the China Distribution defendants") on JPMS's claims of fraud, RICO, and conversion, (2) granting summary judgment against Quality King Distributors, Inc. on JPMS's replevin claim, (3) holding Quality King in contempt of the Court's September 22, 1999 Temporary Restraining Order, and (4) granting JPMS costs and disbursements. The China Distribution defendants have cross-moved for summary judgment in their favor on the fraud, RICO, and conversion claims pursuant to Rule 56 or for judgment on the pleadings pursuant to Rule 12(c). Defendant Quality King has moved for summary judgment against JPMS pursuant to Rule 56 with respect to the replevin claim and has cross-moved for sanctions and attorneys' fees against JPMS pursuant to Rule 11.

JPMS's motion for summary judgment and its application to have Quality King found in contempt are denied in their entirety. The China Distribution defendants' motion for summary judgment in their favor on the fraud, RICO and conversion claims is granted. Quality King's motion for summary judgment in its favor on the replevin claim is granted and its motion for sanctions is denied.

BACKGROUND

JPMS, a California corporation, manufactures more than $100 million in Paul Mitchell hair and skin care products annually. It contractually requires its distributors to sell JPMS product only to professional hair care salons. (Tr. 278.) [FN1] Defendant Quality King Distributors, Inc., a New York corporation, is a wholesale distributor of a variety of consumer products. The China Distribution defendants were allegedly involved in a fraudulent scheme to induce JPMS to sell Paul Mitchell products to China Distribution & Marketing, Ltd. ("China Distribution"), a Chinese corporation, under the pretense that those products would be distributed to professional hair salons in China. However, the China Distribution defendants instead caused the products to be diverted from China and ultimately shipped back to the United States and distributed by Quality King to various outlets that were not professional hair salons.

> FN1. References to "Tr. ___" are to pages of the transcript of the preliminary injunction hearing dated March 9 and 13, 2000.

JPMS charges that the fraud began in 1996, when defendant Jerome Alexander approached John Paul DeJoria, CEO and Chairman of JPMS, and broached the idea of starting a Paul Mitchell distributorship in China. DeJoria testified that Alexander, whom DeJoria had known since 1971, claimed to understand JPMS's policy of selling product only through professional hair salons, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DeJoria had similar conversations with Alexander's son, Berin Alexander, and their partner, Robert Seibel, regarding that policy. (Tr. 61.)

Based in part upon these representations, DeJoria entered into a contract on behalf of JPMS with China Distribution in December of 1996. (Tr. 60, 62.) The contract, with a term beginning on January 1, 1997 and ending on June 30, 1998, explicitly limited sales of Paul Mitchell product by China Distribution to professional hair salons located in China. Beginning in 1997 JPMS began sending Paul Mitchell products to China Distribution in Shanghai.

*2 In connection with the launch of Paul Mitchell products in China, DeJoria and JPMS hair stylists and product development personnel visited China and witnessed what at the time they believed were the early stages of China Distribution's distribution efforts. The JPMS employees conducted shows in Beijing and Shanghai, visited hair salons in those cities, and appeared on television and in newspapers--public events all organized by China Distribution. From JPMS's perspective, the introduction of Paul Mitchell products in China appeared to be proceeding successfully. (Tr. 64-65.)

Unbeknownst to JPMS, China Distribution sold nearly all the Paul Mitchell products to a middleman named Niv Vigdor, an individual who, although named as a defendant, has not yet appeared in this action. Vigdor shipped those products to Rotterdam and from there to Quality King in Ronkonkoma, New York. This scheme continued until JPMS stopped shipping goods to China Distribution in March of 1999.

DeJoria first suspected diversion of the JPMS product in March of 1998, when JPMS discovered that non-hair care salon retail outlets in the United States possessed several dozen bottles of the Paul Mitchell product that it had earlier sold to China Distribution. (Tr. 69, 219.) DeJoria immediately called Jerome Alexander, who claimed that approximately 1,000 bottles had been stolen from the port of Shanghai in 1997 and that these bottles must have found their way back to the United States. (Tr. 69-70.) Alexander's partner and China Distribution's lawyer, Robert Seibel, sent a letter to JPMS dated May 8, 1998 to the same effect, and both Alexander and Seibel repeatedly assured JPMS that all of the other products had been sold to professional hair care salons in China. Lacking definitive proof of diversion, on May 21, 1998, JPMS extended the China Distribution contract until December 31, 1998. (Plt.Exh. 97.) The renewal contract--just as the initial contract--prohibited diversion by China Distribution of the Paul Mitchell product outside of China or to retailers other than professional hair salons.

Throughout this period, JPMS was growing increasingly suspicious of the China Distribution operation. As more Paul Mitchell products sold to China Distribution appeared in--the United States, JPMS requested documentation demonstrating China Distribution's inventory and sales controls. JPMS subsequently refused to renew China Distribution's contract for 1999 unless the officers of China Distribution provided a $1,000,000 personal guaranty that China Distribution would not divert product. (Tr. 236.) Because China Distribution's officers refused to provide that guaranty, China Distribution's contract was not renewed. Nonetheless, JPMS shipped product to China Distribution in 1999 on an order-by-order basis. (Tr. 239.) In August of 1999, a JPMS employee traveled to China to review China Distribution's distribution network, and discovered substantial proof of diversion.

*3 Shortly thereafter, JPMS commenced this litigation, and this Court issued a temporary restraining order enjoining the sale, transfer or marketing of any product originally bought by China Distribution to any person or entity other than a Chinese hair care salon. On June 8, 2000, this Court denied JPMS's motion for a preliminary injunction to restrain Quality King from selling the subject Paul Mitchell products. *John Paul Mitchell Sys. v. Quality King Distribs.,* 106 F.Supp.2d 462 (S.D.N.Y.2000). Following the completion of discovery proceedings, the parties moved for the relief described above.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 3

Not Reported in F.Supp.2d, 2001 WL 910405 (S.D.N.Y.), RICO Bus.Disp.Guide 10,125
**(Cite as: 2001 WL 910405 (S.D.N.Y.))**

DISCUSSION

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quoting Fed.R.Civ.P. 56(c)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party." ' *Allen,* 64 F.3d at 79 (citation omitted) (quoting *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with specific facts to show there is a factual question that must be resolved at trial. Fed.R.Civ.P. 56(e); *see also Legal Aid Society v. City of New York,* 114 F.Supp.2d 204 (S.D.N.Y.2000). A nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). In short, a nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

I. The China Distribution Defendants Are Entitled to Summary Judgment in Their Favor on JPMS's Fraud, RICO, and Conversion Claims.

A. The China Distribution Defendants Are Entitled to Summary Judgment on JPMS's Fraud Claim.

The elements of a cause of action for fraud are " 'representation of a material existing fact, falsity, scienter, deception and injury ." ' *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 639 N .Y.S.2d 283, 662 N.E.2d 763 (1995) (quoting *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958)). JPMS contends that the China Distribution defendants made two categories of misrepresentations to JPMS. First, at the outset of the parties' relationship, the China Distribution defendants knowingly falsely promised that the product would not be diverted out of China. (Tr. 62, 69-70.) Second, the defendants later concealed the true nature of the enterprise and denied any intentional diversion even when directly confronted by JPMS. (Potter Decl. Exhs. 77-79; Tr. 76, 264.)

*4 These misrepresentations cannot support a fraud claim pursuant to New York law because JPMS's claim is premised exclusively upon a breach of contractual duties and any alleged misrepresentations were inextricably linked with the contract. The first category of misrepresentations is not actionable in fraud because it was part and parcel of the China Distribution defendants' express contractual promise not to distribute the product outside of China. JPMS contends it was fraudulently induced to enter the distribution contract based upon promises made before the formation of the contract with the preconceived intention of not performing them. However, it is settled that, pursuant to New York law, a claim for fraud or fraudulent inducement predicated upon a breach of a contract between the parties cannot be asserted by simply alleging that the defendant never intended to comply with its contractual obligations. *See Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98 Civ. 3662, 2000 WL 1182812, at *1 (S.D.N.Y. Aug. 21, 2000); *International CableTel Inc. v. Le Groupe Videotron Ltee,* 978 F.Supp. 483, 486 (S.D.N.Y.1997) (citing *Rocanova v. Equitable Life Assurance Soc'y,* 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940 (1994)).

To maintain a claim of fraud based on a misrepresentation supporting a claim for breach of contract, a plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 4

Not Reported in F.Supp.2d, 2001 WL 910405 (S.D.N.Y.), RICO Bus.Disp.Guide 10,125
**(Cite as: 2001 WL 910405 (S.D.N.Y.))**

as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Svces., Inc.,* 98 F.3d 13, 20 (2d Cir.1996) (citations omitted); *Cougar Audio, Inc. v. Reich,* No. 99 Civ. 4498, 2000 WL 420546, at *6 n. 4 (S.D.N.Y. Apr. 18, 2000). JPMS has failed to identify any legal duty owed by defendants to JPMS separate from the duty to perform under the contract, and there has been no showing of "special damages" caused by any misrepresentation other than the breach of contract. *See Bridgestone/Firestone,* 98 F.3d at 20; *Bruce v. Martin,* Nos. 87 Civ. 7377, 90 Civ. 0870, 90 Civ. 4651, 1993 WL 148904, at * 5 (S.D.N.Y. Apr. 30, 1993).

Therefore, JPMS's claim for fraud against the China Distribution defendants can proceed only if any of the China Distribution defendants' false statements of future intent concerned a matter collateral or extraneous to the terms of the agreement between the parties. *See Ohio Players, Inc. v. Polygram Records,* No. 99 Civ. 0033, 2000 WL 1616999, at *2 (S.D.N.Y. Oct. 27, 2000); *Leonard v. Pepsico, Inc.,* 88 F.Supp.2d 116, 131 (S.D.N.Y.1999); *S.O. Textiles Co. v. A & E Prods. Grp.,* 18 F.Supp.2d 232, 240 (E.D.N.Y.1998); *International CableTel Inc,* 978 F.Supp. at 491; *Hudson Optical Corp. v. Cabot Safety Corp.,* 971 F.Supp. 108, 109 (E.D.N.Y.1997). A representation that performance will be made is not distinct from the contract. *Crabtree v. Tristar Auto. Group, Inc.,* 776 F.Supp. 155, 162-63 (S.D.N.Y.1991). Moreover, promises serving as inducement for the execution of the contract, such as representations of expertise and resources, are not considered collateral to the contract because they "simply underscore the defendant's purported intention and ability to perform the contract" and are thus "simply part and parcel of the intention to perform." *Id.* at 163.

**\*5** China Distribution's pre-contractual representations not to divert the product were not "collateral or extraneous to the terms of the parties' agreement." Rather, they were entirely consistent with the express terms of the agreement. JPMS claims that China Distribution had a perpetual obligation never to divert JPMS products pursuant to the express terms of the distributorship agreement it entered into. (JPMS Mem. at 4, citing DeJoria Dep. at 84; Potter Decl. Exs. 54 at ¶ X(F)(3), 97 at ¶ 7(b) (China Distribution "will never sell, distribute, or otherwise divert [JPMS] Products to any drug store, supermarket, mass merchandiser, wholesaler or unauthorized distributor").) China Distribution's pre-contractual representation not to divert was the very same promise expressly incorporated into the contract, and JPMS therefore may not recover for fraud based upon those pre-contractual representations.

Defendants' post-contractual statements to conceal the breach of contract are also not actionable because intentionally false statements to conceal a breach of contract do not give rise to an action for fraud. *Ikea North Amer. Svces., Inc. v. Northwest Graphics, Inc.,* 56 F.Supp.2d 340, 342 (S.D.N.Y.1999); *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.,* 893 F.Supp. 285, 290 (S.D.N.Y.1995). JPMS contends that the China Distribution defendants orchestrated events to conceal their diversion of the JPMS products and later lied to JPMS regarding the diversion of product. (JPMS Mem. at 5-6.) As in *Ikea,* these claims of misrepresentations are limited to "false statements of contractual performance and attempted concealments of contractual breach." 56 F.Supp.2d at 342. Summary judgment is thus appropriate in favor of the China Distribution defendants on JPMS's fraud claim because JPMS's claim is premised entirely upon a breach by the China Distribution defendants of their contractual duties.

**B. The China Distribution Defendants Are Entitled to Summary Judgment on JPMS's RICO Claim.**

A violation of 18 U.S.C. § 1962(c), the RICO section on which JPMS sues, requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). JPMS has attempted to establish the predicate racketeering acts of federal mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343; transporting, receiving, storing and selling fraudulently obtained products in violation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of 18 U.S.C. §§ 2314 and 2315; grand larceny in violation of New York Penal Law § 155; falsifying business records in violation of New York Penal Law § 175.10; and scheming to defraud in violation of New York Penal Law § 190.65. (Compl.¶ 61.) That attempt is unsuccessful.

First, a plaintiff who simply contends that it was defrauded into entering into a contract by another who never intended to honor the contract has not made "any legally sufficient allegation of fraud, [and] cannot allege mail [or wire] fraud" for purposes of a section 1962 RICO claim. *Goldfine v. Sichenzia,* 118 F.Supp.2d 392, 406 (S.D.N.Y.2000); *see also Spoto v. Herkimer County Trust,* No. 99 Civ. 1476, 2000 WL 533293 at *5 (N.D.N.Y. Apr. 27, 2000). Therefore, RICO claims predicated upon such fraud "are deficient as a matter of law, and ... must be dismissed." *Id.*

*6 Second, JPMS may not base its RICO claim on the acts of transporting, receiving, storing and selling fraudulently obtained products in violation of 18 U.S.C. §§ 2314 and 2315, as there has been no proper allegation that the products at issue were fraudulently obtained. Third, the New York state crimes of grand larceny, falsifying business records, and scheming to defraud are not racketeering predicates because they do not fall into one of the specifically enumerated categories of "racketeering activity" as defined by 18 U.S.C. § 1961(1). Thus, summary judgment is warranted because JPMS has failed to establish a "pattern of racketeering activity" as required to support a RICO claim. *Sedima,* 473 U.S. at 496.

C. The China Distribution Defendants Are Entitled to Summary Judgment on JPMS's Conversion Claim.

"Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir.1997) (quotation omitted). "However, a conversion claim cannot be based on a breach of contract," and JPMS has "failed to 'allege facts that constitute unlawful or wrongful behavior separate from a violation of contractual rights." ' *Elma RT,* 2000 WL 1182812, at *2 (quoting *Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984)). Summary judgment on the conversion claim should therefore be entered in favor of the China Distribution defendants.

II. Quality King Is Entitled to Summary Judgment in Its Favor on JPMS's Replevin Claim.

Both JPMS and Quality King have moved for summary judgment on JPMS's replevin claim. In order to establish a cause of action in replevin, the owner of the property must demonstrate that he or she has an immediate and superior right to possession of the chattel, including proof of ownership. *See Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1473 (S.D.N.Y.1992). JPMS has failed to establish any issues of material fact regarding its right to possession of the specific product acquired by Quality King.

JPMS contends that the China Distribution defendants fraudulently obtained the product and passed on defective title to Quality King. However, as set forth above, China Distribution did not acquire the goods by fraud. Title therefore passed from JPMS to China Distribution when JPMS delivered the goods, and JPMS retained no possessory interest. *See* UCC § 2-401(2) ("[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods"). The fact that China Distribution may have later breached its contract with JPMS by selling to an intermediary who then sold to Quality King does not restore any possessory rights to JPMS.

JPMS has taken the untenable position of seeking the return of goods for which it has already been paid in full. Summary judgment is appropriate in favor of Quality King because there are thus no issues of material fact regarding whether JPMS has any "immediate and superior right to possession of the chattel." *Van Brunt,* 799 F.Supp. at 1473.

III. Quality King Did Not Act in Contempt of a

Not Reported in F.Supp.2d                                                                                       Page 6

Not Reported in F.Supp.2d, 2001 WL 910405 (S.D.N.Y.), RICO Bus.Disp.Guide 10,125

**(Cite as: 2001 WL 910405 (S.D.N.Y.))**

Court Order, and Quality King's Claim for Sanctions Is Unwarranted.

***7** JPMS seeks to have Quality King held in contempt for having purchased JPMS products from Vigdor after it was served with the Temporary Restraining Order in this action, which was entered on September 22, 1999. JPMS contends that Quality King violated the TRO by purchasing the product from Vigdor on October 4 and 6, 1999, and moving it to its warehouse in Ronkonkoma, New York, in violation of the TRO. Quality King is not accused of selling the product, or even transferring it out of its warehouse, during the pendency of the TRO.

A contempt movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. *See New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1351 (2d Cir.1989). A clear and unambiguous order is one that leaves "no uncertainty in the minds of those to whom it is addressed," *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 116 (2d Cir.1988), who "must be able to ascertain from the four corners of the order precisely what acts are forbidden," *see Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir.1989).

JPMS has failed to show clear and convincing proof of Quality King's noncompliance. The Court entered a TRO on September 22, 1999, restraining and enjoining all defendants from "concealing, marketing, selling, dissipating, moving, transferring or otherwise distributing any product that was originally sold by Paul Mitchell to China Distribution & Marketing, Ltd." (Potter Decl. Exh. 63.) This TRO was extended on consent of the parties until the determination of JPMS's motion for a preliminary injunction. (Brener Decl. in Opp. Exh. A, pp. 23-24.)

JPMS's theory is that by purchasing and receiving products from Vigdor, Quality King "moved" the products to its own warehouse in Ronkonkoma in violation of the TRO. (Plt. Contempt Mem. at 24.) However, while the language of the preliminary injunction--barring "movement, transfer, or other distribution" of the products--clearly and unambiguously prevented Quality King from distributing the products, it did not clearly and unambiguously prevent Quality King from acquiring the products. Thus, there has been no showing that Quality King directly violated a clear and ambiguous order simply by assuming and retaining possession over the product.

JPMS has also advanced a second theory of why Quality King should be held in contempt, namely that Quality King aided and abetted contempt of the Court order by Niv Vigdor by enabling Vigdor to sell the goods to Quality King. However, the TRO did not bar Quality King from aiding a sale by another. Unlike the case of *New York by Abrams v. Foreman,* 834 F.Supp. 116, 117 (S.D.N.Y.1993), cited by JPMS, Quality King was not ordered to refrain from advancing any of Vigdor's activities, and was simply forbidden from itself distributing the products.

**\*8** Additionally, the purpose of the TRO was to prevent the contested product from being dissipated into the stream of commerce, as evidenced by the stipulation agreed upon by the parties dated December 16, 1999 which states that Quality King "shall be deemed to be in compliance with the TRO by continuing to hold [the products] in its warehouse." (Potter Decl. Exh. 4; *see also* Brenner Decl. Exh. I.) It is uncontested that Quality King segregated and stored the product at issue in its warehouse until this Court decided the preliminary injunction motion, and, as noted, there are no allegations that Quality King sold, distributed, or otherwise removed any of the merchandise from its warehouse during the life of the TRO. The Court will not exercise its discretion to hold Quality King in contempt for actions which did not violate the words or intent of the TRO.

Quality King's motion for sanctions upon JPMS pursuant to Rule 11 is denied because JPMS's motion is not so lacking in merit as to be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 7
Not Reported in F.Supp.2d, 2001 WL 910405 (S.D.N.Y.), RICO Bus.Disp.Guide 10,125
**(Cite as: 2001 WL 910405 (S.D.N.Y.))**

sanctionable.

CONCLUSION

The China Distribution defendants' motion for summary judgment in their favor on the fraud, RICO and conversion claims is granted. Quality King's motion for summary judgment in its favor on the replevin claim is granted and its motion for sanctions is denied. JPMS's motion for summary judgment in its favor and its application to have Quality King found in contempt are denied in their entirety. Judgment shall enter accordingly.

Not Reported in F.Supp.2d, 2001 WL 910405 (S.D.N.Y.), RICO Bus.Disp.Guide 10,125

**Motions, Pleadings and Filings (Back to top)**

• 2001 WL 34727787 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Further Support of Defendant Quality King Distributors, Inc.'s Motion for Sanctions Under Fed. R. Civ. P. 11 (Jan. 25, 2001)

• 2001 WL 34727781 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Further Support of Its Motion for Partial Summary Judgment and Contempt Against Quality King Distributors, Inc. and in Opposition to Motion for Sanctions (Jan. 16, 2001)

• 2001 WL 34727782 (Trial Motion, Memorandum and Affidavit) Defendant Quality King Distributors, Inc.'s Reply Memorandum in Further Support of Its Motion for Summary Judgment (Jan. 16, 2001)

• 2001 WL 34727784 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law (Jan. 16, 2001)

• 2001 WL 34727785 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Further Support of Its Motion for Summary Judgment Against the China Distribution Defendants and in Opposition to Their Cross-Motion for Summary Judgment (Jan. 16, 2001)

• 2001 WL 34727786 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendant Quality King Distributors, Inc.'s Motion for Sanctions Under Fed. R. Civ. P. 11 (Jan. 16, 2001)

• 2000 WL 34475016 (Trial Motion, Memorandum and Affidavit) Defendant Quality King Distributors, Inc.'s Memorandum in Opposition to John Paul Mitchell Systems' Motion for Summary Judgment and Contempt (Dec. 20, 2000)

• 2000 WL 34475018 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendant Quality King Distributors, Inc.'s Motion for Summary Judgment (Dec. 18, 2000)

• 2000 WL 34475017 (Trial Motion, Memorandum and Affidavit) Defendant Quality King Distributors, Inc.'s Memorandum in Support of Its Motion for Summary Judgment (Nov. 08, 2000)

• 2000 WL 34475015 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment and Application to Have Quality King Held in Contempt (Nov. 03, 2000)

• 1999 WL 33919704 (Trial Pleading) Answer to Cross-Claims (Nov. 22, 1999)

• 1999 WL 33919703 (Trial Pleading) Answer (Nov. 12, 1999)

• 1999 WL 33919699 (Trial Pleading) Answer (Oct. 25, 1999)

• 1999 WL 33919700 (Trial Pleading) Answer (Oct. 25, 1999)

• 1999 WL 33919701 (Trial Pleading) Answer (Oct. 25, 1999)

• 1999 WL 33919739 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Memorandum in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 8
Not Reported in F.Supp.2d, 2001 WL 910405 (S.D.N.Y.), RICO Bus.Disp.Guide 10,125
**(Cite as: 2001 WL 910405 (S.D.N.Y.))**

Support of Its Motion for a Preliminary Injunction (Oct. 05, 1999)

- 1999 WL 33919738 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Support of Its Application for a Temporary Restraining Order and Expedited Discovery (Sep. 22, 1999)

- 1:99cv09905 (Docket) (Sep. 22, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.